IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

OLANDA BLACK,

    Plaintiff,

     v.

JO ANNE B. BARNHART,
Commissioner of Social Security,

    Defendant.

CIVIL ACTION

NO. 1:04-CV-2241-GGB

## **FINAL ORDER**

Plaintiff Olanda Black, through counsel, brings this action pursuant to the Social Security Act, 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying his application for a period of disability and for disability insurance benefits. Plaintiff applied for benefits on November 3, 1999. The Social Security Administration ("SSA") denied his application initially and on reconsideration. Plaintiff requested a hearing before an administrative law judge ("ALJ"), and one was held on June 4, 2002. On February 28, 2003, the ALJ issued a decision denying Plaintiff's claim. The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.

Plaintiff has exhausted his administrative remedies, and this case is ripe for judicial review. The parties have consented to jurisdiction before a United States

Magistrate Judge.  (Docs. 11-12).  For the reasons stated below, the Commissioner's final decision denying Claimant's application for a period of disability and disability insurance benefits is **REVERSED and REMANDED**.

I.    <u>FACTS</u>

Plaintiff, a high-school graduate who had worked previously as a paint filler and strainer and a security guard, was 51 years old at the time of his administrative hearing. (Tr. at 347-49, 359).  Plaintiff alleged that he became disabled on May 11, 1999, due to lower back pain, numbness in the fingertips of his left hand, numbness and weakness in his right leg, and headaches.  (<u>Id.</u> at 91).

A.    <u>Medical Evidence</u>

1.    **Plaintiff's Physical Impairments**

On June 27, 1997, the radiology department at South Fulton Medical Center found that Plaintiff had a foraminal impingement at C3-4.  (<u>Id.</u> at 169).  An MRI of Plaintiff's spine taken on December 17, 1997, revealed that Plaintiff had mild degenerative disc disease and minimal spinal stenosis at the L5-S1 level.  (<u>Id.</u> at 167).

2

On February 24, 1998, Dr. Mohammad Al-Mulki diagnosed Plaintiff with herniated lumbar disc disease.  (Id. at 211).  On May 12, 1999, Plaintiff reported to Dr. Al-Mulki with right foot pain.  (Id. at 202).

Plaintiff was involved in an automobile accident in August 1999.  (See id. at 352). X-rays taken after the auto accident showed that Plaintiff suffered spurs, herniation, and compression at L5-S1.  (Id. at 179, 181).

After another visit to Dr. Al-Milki on September 21, 1999, Dr. Al-Mulki wrote that Plaintiff suffered from dizziness, blurred vision, stress, and chronic headaches. (Id. at 198-99).  On April 4, 2000, Dr. Al-Mulki again saw Plaintiff, this time with dizzy spells, palpitations, and headaches.  (Id. at 188).

On May 10, 2000, Dr. Don Morris, an orthopaedist, reported degenerative disc disease at both C3-4 and L5-S1 and concluded that Plaintiff's problems were permanent absent surgery.  Dr. Morris indicated that Plaintiff could not stand or walk for prolonged periods of time, could not lift more than 30 pounds, and could not bend or stoop repetitively.  (Id. at 241-42).  On May 17, 2000, Dr. Morris prescribed Voltaren for Plaintiff's neck pain.  (Id. at 241).  On October 23, 2000, Plaintiff returned to Dr. Morris because he was concerned about pain radiating down his left leg with numbness in his foot; Dr. Morris noted that Plaintiff's leg pain had crossed from his

3

right leg to his left leg.  (Id. at 240).  Upon questioning, Plaintiff told Dr. Morris that he had recently had a more strenuous day than usual because he had been helping his sons with yard work and had done a lot of lifting, stooping, bending, and standing.  (Id.). The resulting pain and numbness lasted for only three hours and had dissipated by the time he awoke the next morning.  (Id.).  Dr. Morris refilled Plaintiff's prescriptions for Voltaren and Flexeril.  (Id.).

Plaintiff again visited Dr. Al-Mulki in August 2000, reporting lower-back discomfort and tingling in his right arm.  (Id. at 200).  On April 19, 2001, Dr. Al-Mulki reported that Plaintiff suffered continued back pain, headaches, and insomnia. (Id. at 177, 278).  On December 3, 2001, Dr. Al-Mulki reported continuing back pain, prolonged headaches, and dizzy spells. (Id. at 269).  His assessment included a continuing diagnosis of vertigo.  (Id. at 270).

On April 22, 2002, Dr . Daniel Schwartzberg reviewed a new MRI of Plaintiff's spine.  The report showed the same compression at L5-S1 as shown by earlier x-rays, as well as lumbar scoliosis.  (Id. at 320).

In April 2002, Dr. Plas T. James, an orthopaedic surgeon, re-examined Plaintiff for the first time in two years.  He determined that Plaintiff's condition had worsened. (Id. at 327).  After ordering and viewing a new MRI, Dr. James concluded that Plaintiff

4

had a "[r]ight C3-C4 herniated nucleus pulposus, large, with right L5-S1 herniated disk." (Id. at 322). Plaintiff reported having headaches, neck pain, right and left arm pain, low back pain greater than right leg pain. (Id.).

On September 5, 2002, Dr. James completed a "Medical Assessment of Ability to do Work-Related Activities (Physical)." (See id. at 328-34). Dr. James opined that Plaintiff could stand and/or walk for 4 hours in an 8-hour workday, but only for 30 minutes at a time. (Id. at 328). Additionally, Plaintiff could sit for 4 hours in an 8-hour workday, but only for 30 minutes at a time. (Id.). He could not lift or carry more than five pounds. (Id.). He could stoop and kneel occasionally, and he could never climb, crouch, or crawl. (Id. at 329). He could not be around heights, moving machinery, or vibrations. (Id.). According to Dr. James, Plaintiff would need more than five unscheduled breaks per day, and he would be expected to miss at least half a day of work more than fours times a month. (Id. at 330).

## 2.    Plaintiff's Mental and Psychological Impairments

On November 8, 1999, Dr. Al-Mulki noted that Plaintiff possibly suffered from depression. (Tr. at 195). Physical therapy notes from November 19, 1999, show that Plaintiff had previously been to Charter Peachford Hospital ("Charter") following a nervous breakdown. Charter had diagnosed Plaintiff with stress. (Id. at 156).

5

On December 3, 1999, Dr. William Yarde reported that Plaintiff had been seeing a psychiatrist and taking Zoloft, but he discontinued the medication because of its side effects. Dr. Yarde prescribed the anti-anxiety drug Xanax instead. (Id. at 178).

On May 17, 2000, Dr. Morris also diagnosed Plaintiff with anxiety; he prescribed Elavil to Plaintiff. (Id. at 241).

On May 8, 2000, psychiatrist Dr. Iqbal Dhanani reported that he had seen Plaintiff twice in late 1999; he diagnosed Plaintiff as having a "psychotic disorder not otherwise specified." (Id. at 266, 339). On May 22, 2000, Dr. Dhanani prescribed Plaintiff both Zoloft and Zyprexa. (Id. at 266).

Psychiatrist Russell Brown evaluated Plaintiff on May 23, 2000, and noted that Plaintiff had been previously hospitalized at Charter in 1970. (Id. at 224). Dr. Brown determined that Plaintiff had a "history of depression" and "pain disorder." He found that Plaintiff's "stressors appeared to be moderate consisting of 1) chronic pain, 2) economic problems." (Id. at 225). Dr. Brown found in part that Plaintiff had depression stemming from his disc disease, chronic pain, difficulty sleeping, and decreased weight. (Id.). Dr . Brown rated Plaintiff's global assessment of functioning at 60. (Id.). In summary, Dr. Brown opined: "On psychological testing, [Plaintiff] was found to be cooperative and maintained good eye contact. Immediate recall, recent

6

memory and remote memory were intact.  His thought processes and thought content appeared normal.  There were no signs of any perceptual distortions.  Cognitively, he appeared intact.  He was able to follow simple commands and maintain his affective stability." (Id. at 225-26).  Dr. Brown concluded that Plaintiff would be able to manage his own funds if he were awarded benefits.  (Id. at 226).

On August 10, 2000, a non-examining State agency psychiatrist completed a psychiatric review form.  (Id. at 230-239).  The psychiatrist reviewed Plaintiff's medical history and found, *inter alia,* that Plaintiff had a pain disorder but did not have a severe mental or psychological impairment.  (See id.).  The psychiatrist opined that Plaintiff experienced only slight restrictions of daily living activities and slight difficulties in maintaining social functioning, and seldom had deficiencies of concentration, persistence, or pace.  (Id. at 237).

On March 7, 2001, another State agency psychiatrist, Dr. Shelby Gennett, completed a psychiatric review form.  (Id. at 244-57).  Dr. Gennett also found that Plaintiff had a pain disorder but did not have a severe impairment.  (Id. at 244, 250).  Additionally, Dr. Gennett found that Plaintiff had mild restrictions of daily living activities, no difficulties in maintaining social functioning, and no deficiencies of concentration, persistence, or pace.  (Id. at 254).

7

Dr. Al-Mulki prescribed Plaintiff Xanax on April 19 and  November 12, 2001. (Id. at 271, 278).

On March 26, 2002, Robert  T. Shepherd, a clinical psychologist, administered to Plaintiff six different standardized tests and a mental status evaluation.  Plaintiff told Dr. Shepherd, *inter alia,* that he drove a car, cleaned his home, went to the store, performed part-time work as a security guard, and regularly attended church.  (Id. at 312-15).  Dr. Shepherd reported, among other things, that on the Wechsler Adult Intelligence Scale, Plaintiff registered a verbal IQ of 66, a performance IQ of 64, and full scale IQ of 62, and a classification of  "Mental Deficiency (mild)."  (Id. at 312). However, Dr. Shepherd opined that Plaintiff's IQ was probably closer to the low 70s, but he was scoring lower due to his "mental inflexibility, his perseveration of ideas, rather than moving on to other topics, and [the low score] also may represent some emotional distress."  (Id. at 313).  The doctor noted that Plaintiff's "reading level at the high school level is considerably higher than one would ever see in a person with a verbal IQ of 66."  (Id.).  Regarding Plaintiff's mental status, Dr. Shepherd concluded that Plaintiff suffers from "Anxiety Disorder due to General Medical Condition."  He found that Plaintiff's anxiety focused upon his severe and frequent headaches and his back, arm, and leg pain.  Additionally, he was easily fatigued, suffered from insomnia,

8

and had trouble concentrating.  (Id. at 314).  However,  Dr. Shepherd concluded that Plaintiff's main problem was depression; on the MMPI, he has almost as high a "depression" score as one could get.  (Id. at 315).  He categorized Plaintiff's depression as "probably a major depressive disorder, moderately-severe, without psychotic features."  (Id.).

On April 11, 2002, Dr. Shepherd completed a "Medical Assessment of Ability to do Work-Related Activities (Mental)."  (Id. at 318-19).  Dr. Shepherd indicated, *inter alia,* that Plaintiff's abilities to relate to coworkers, deal with work stresses, understand, remember, and carry out complex job instructions, and behave in an emotionally stable manner were "poor" or "none."  (Id.).  Dr. Shepherd's comments included, "Judgment is appropriate at the level of a mildly retarded person . . . .  [I]t is difficult to imagine that he could function entirely independently  . . . .  He is emotionally disturbed by both major depression and generalized anxiety, and this makes him subject to overreact or react negatively to any kind of unpleasant situation."  (Id.).

**B.    Plaintiff's Hearing Testimony**

Plaintiff's administrative hearing was held on June 4, 2002.  (Id. at 341).  In pertinent part, Plaintiff testified to the following:

9

Per the advice of two physicians, Plaintiff stopped working in May 1999 after experiencing numbness in his right leg and lower back pain.  (Id. at 350-51).  In August 1999, he was involved in an automobile accident which exacerbated his injuries.  (Id. at 352).  Plaintiff initially stated that, prior to his auto accident, he could walk for two blocks; after the accident, he could walk for only one block.  (Id. at 352-53).  Plaintiff later stated that, as of the date of the hearing, he could probably walk a mile, but he would have to lie down and recover afterward.  (Id. at 362).  Plaintiff  also experienced numbness and "pins and needles" in his arms and fingers.  (Id. at 364-65).

Additionally, Plaintiff suffered from two to three severe headaches per week that forced him to sit or lie down for an hour or two.  (Id. at 353-57).  He was able to alleviate his headaches by using a cold compress, drinking coffee, taking medication, and taking a nap.  (Id. at 356-57).

Plaintiff's doctors told him that his various pain problems were caused by a herniated disc in his neck.  (Id. at 354-55).  Dr. James recommended that he undergo surgery on his neck and lower back.  (Id. at 360).

Apart from his physical problems, Plaintiff suffered from feelings of uselessness stemming from his physical limitations, and he experienced some difficulty sleeping.

AO 72A
(Rev.8/82)

(Id. at 361-62).   In addition, he experienced problems with his memory and concentration.  (Id. at 363-64).

Despite his physical and psychological problems, Plaintiff returned to full-time work as a security guard in December 2001, and he was working full-time as a security guard at the time of the hearing.  (See id. at 85, 346, 357-59).

### C.   Vocational Expert's Hearing Testimony

A vocational expert ("VE"), who was present throughout Plaintiff's testimony, described Plaintiff's vocational history and skills.  (Id. at 367-68).  The ALJ asked the VE to consider a hypothetical person of Plaintiff's age, education level, and work experience, who was limited to a light exertional level, with pushing and pulling of the lower and upper extremities limited to "occasionally"; with no climbing of ladders, ropes, or scaffolds; with climbing of ramps and stairs limited to "frequently"; and with balancing, stooping, kneeling, crouching, and crawling limited to "occasionally."  (Id. at 368-69).  The VE testified that such a person could not perform Plaintiff's past work.  (Id. at 369).  However, the VE opined that such a person could perform a wide range of light, unskilled positions, such as an assembler of small parts or electrical equipment assembler—positions of which there existed a significant number in the national and regional economies.  (Id. at 369-70).

11

The ALJ then asked the VE to consider a hypothetical person with the same limitations who required a job that allowed the option to sit or stand.  (Id. at 370).  The VE answered that there were a significant number of such jobs in the Georgia and national economies, including cashier II, ticket seller, and gate tender.  (Id. at 370-71).

Next, the ALJ asked the VE to consider whether sedentary jobs existed that the same hypothetical person could perform.  (Id. at 374).  The VE replied that the hypothetical person could perform the sedentary positions of surveillance system monitor, telephone order clerk, and sitter, all of which existed in a significant number in the Georgia and national economies.  (Id. at 374-75).  In response to the ALJ's query, the VE added that the hypothetical person would still be able to perform those jobs, even if that person was limited mentally to performing "simple one-two step tasks . . . some semi-detailed . . . ."  (Id. at 375).

The VE stated that the hypothetical person could perform all of the jobs that had been listed if he was experiencing mild to moderate pain.  (Id. at 375-76).  However, according to the VE, that hypothetical person could not maintain such employment if he was experiencing chronic pain at the moderately severe to severe range.  (Id. at 376).  The VE testified that his responses were consistent with information contained in the Dictionary of Occupational Titles.  (Id.).

12

In response to Plaintiff's counsel's questioning, the VE agreed that if the hypothetical person had no useful ability to deal with stress and no useful ability to behave in an emotionally stable manner (as Dr. Shepherd described Plaintiff's condition), the hypothetical person could not maintain employment.  (Id. at 378-79). Finally, the VE opined that the hypothetical person could not maintain employment if he suffered from headaches twice a week that required him to take one- or two-hour breaks at unanticipated times.  (Id. at 379).

**D.    ALJ's Findings**

In pertinent part, the ALJ found that Plaintiff returned to work as a security guard in December 2001, earning wages above the substantial gainful activity level, and, thus, only the period of time from May 11 to December 1, 2001, remained to be adjudicated. (Id. at 16).  The ALJ determined that the medical evidence indicated that Plaintiff had cervical degenerative disc disease, lumbar degenerative disc disease with radiculopathy, and lower back pain.  (Id. at 17).  The ALJ stated that such impairments were "severe within the meaning of the Regulations, but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."  (Id.).

The ALJ afforded great weight to the non-examining State agency medical consultant's opinion that Plaintiff "retained a light exertional level with additional

nonexertional limitations" because, according to the ALJ, it was consistent with the medical evidence as a whole.  (Id. at 19).  The ALJ also afforded great weight to the opinions of the non-examining State agency psychological consultants that Plaintiff did not have a severe mental impairment because he determined that the consultants' opinions were consistent with the evidence as a whole.  (Id. at 20).

The ALJ went on as follows:

> The medical evidence of record clearly reveals that none of the claimant's treating physicians stated that he was disabled to work. Dr. Morris gave him restrictions, which he indicated were permanent unless the claimant decided to have surgery; however, Dr. Morris did not say that the claimant could not work. . . .  It is reasonable to assume that if the claimant could work in the yard doing lifting, stooping bending and prolonged standing, he should be able to engage in substantial gainful activity at some level.   The claimant's testimony that he had been working as a security guard since December 2001 is indicative of his ability to work.

> The claimant's statements about his impairments and their impact on his ability to work cannot be fully credited.  While the medical evidence reveals that the claimant has been diagnosed with underlying conditions, including cervical degenerative disc disease; lumbar degenerative disc disease with radiculopathy; and low back pain; the objective medical evidence does not support the severity of pain and other subjective symptoms alleged by the claimant. Additionally, none of the claimant's conditions are of the severity that they could reasonable be expected to give rise to the claimant's alleged pain and other symptoms.

As discussed above, the claimant does have physical limitations but they do not preclude all work. Pending surgery, Dr. Morris has limited him to basically light work with no prolonged standing. . . . The undersigned does not accept Dr. [James'] assessment of September 5, 2002 that [is] more limiting than Dr. Morris'. Dr. Morris' limitations are reasonable as demonstrated by the claimant's return to work as a security guard. Dr. [James'] assessment would preclude all work which is diametrically inconsistent with the salient fact that the claimant is working now with no demonstrated medical improvement in his condition from May, 1999.

Similarly, Dr. Shepherd's assessment of the claimant's mental ability to perform work-related activities would lead one to the conclusion that the claimant could not work due to no useful ability to function in the areas of relating to co-workers and dealing with work stresses. Yet, the claimant is successfully making those adjustments on [a] daily basis. Furthermore, the claimant's work history, school history and longitudinal medical history give no support for his diagnosis of mental retardation. The consultative examination of Dr. Brown gives no indication of any severe medical impairment which is concurred by two State Agency consultants who agree that the claimant's limitations are primarily physical. The undersigned notes that the claimant's physical impairments were thoroughly worked-up by his physicians and none of them referred him for mental health treatment. The undersigned gives no weight to Dr. Shepherd's evaluation.

Accordingly, the undersigned finds [that] the claimant has a residual functional capacity for light work with a sit/stand option, with pushing and pulling of the bilateral lower and upper extremities limited to occasionally; no climbing ladders, ropes, scaffolds; climbing ramps and stairs limited to frequently; and balancing, stooping, kneeling, crouching, and crawling limited to

15

occasionally; and the claimant is limited to performing simple mental tasks.

As a result of the claimant's mental impairments he would have mild restrictions of daily living, he would have mild difficulties in maintaining social functioning, he would have moderate deficiencies of concentration, persistence or pace performing detailed tasks but mild to no deficiencies performing simple tasks[,] and he had never had episodes of decompensation.

(Id. at 21-22).

The ALJ noted that the VE testified that a hypothetical person with Plaintiff's residual functional capacity could perform a significant number of jobs in the Georgia and national economies.  (Id. at 22).  The ALJ thus concluded that, through the date of the decision, Plaintiff had not been under a "disability" as defined in the Social Security Act.  (Id.).  After considering the additional evidence submitted by Plaintiff, the Appeals Council summarily denied Plaintiff's request for review.  (Id. at 6-9).


## II.   DEFINITION OF "DISABILITY" AND BURDEN OF PROOF

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than

12 months." 42 U.S.C. § 423(d)(1)(A). The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423 (d)(2),(3).

The burden of proof in a disability case is divided between the claimant and the Commissioner. The claimant bears the initial burden of establishing the existence of a disabling condition by demonstrating that he is unable to perform his former type of work. Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983). Once the claimant has met this burden, the burden of production shifts to the Commissioner to show that, considering the claimant's age, education, work experience, and impairment, other jobs exist in the national economy that the claimant can perform. See Boyd, 704 F.2d at 1209. The overall burden of persuasion, however, remains with the claimant to prove that he is unable to perform any of the jobs suggested by the Commissioner. See id.

17

III.   **STANDARD OF REVIEW**

In reviewing the Commissioner's decision, this court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).  The court's only role is to determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. Walden v. Schweiker, 672 F.2d 835 (11th Cir. 1982); 42 U.S.C. § 405(g).  "Substantial evidence" means such "relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986); Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).  It may be present even if a preponderance of the evidence weighs in favor of the claimant.  Barnes, 932 F.2d at 1358.

This standard of review, however, does not "relieve the court of its responsibility to scrutinize the record in its entirety to ascertain whether the substantial evidence supports each essential administrative finding."  Walden, 672 F.2d at 838.  Indeed, "[i]t is incumbent upon the reviewing court to examine the findings and decisions of the [Commissioner] in light of the record in its entirety, not only that evidence which supports the decision."  Lamb v. Bowen, 847 F.2d 698, 701 (11th Cir. 1988).

18

In contrast to the Commissioner's findings of fact, no presumption of validity attaches to the Commissioner's application of the law. Lamb, 847 F.2d at 701. "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983). Thus, the Commissioner must "apply the correct law" and, importantly, must also "provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted . . . ." Keeton v. Department of Health and Human Services, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing Cornelius v. Sullivan, 936 F.2d 1143, 1146 (11th Cir. 1991)); see also Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (the ALJ must "state specifically the weight accorded to each item of evidence and why he reached that decision. In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence"); Owens v. Heckler, 748 F.2d 1511, 1514 (11th Cir. 1984)(the Commissioner must engage in "reasoned decision making"); Ryan v. Heckler, 762 F.2d 939, 941-42 (11th Cir. 1985) (the ALJ must "state with sufficient clarity the legal rules being applied and the weight accorded the evidence considered").

19

**IV.**   **DISCUSSION**

Plaintiff presents several arguments on appeal, many of which concern the ALJ's treatment of his mental impairments.  In this regard, he argues, *inter alia,* that the ALJ erred by (1) relying on the opinions of the non-examining psychological consultants, (2) by failing to find that he suffers from severe mental impairments, (3) by ignoring or failing to discuss pertinent evidence regarding his mental health, especially evidence regarding his pain disorder and anxiety, and (4) by failing to consider the cumulative effect of his impairments, both physical and mental.  With respect to his physical impairments, Plaintiff argues, *inter alia,* that the ALJ (1) improperly ignored evidence regarding his severe headaches and (2) misconstrued Dr. Morris' opinion regarding his functional limitations.  The court finds many of these arguments to be meritorious but will discuss only Plaintiff's mental impairments.

The ALJ implicitly found that Plaintiff does not suffer from a severe mental impairment.  (See Tr. at 17, 21-22).  He appears to have reached this conclusion by relying on the opinions of the two non-examining consultative psychologists.  (See Tr. at 20).  Both of these consultants concluded that Plaintiff suffers from a non-severe "pain disorder," but that he does not suffer from depression or anxiety.  (See Tr. at

20

230, 233-34, 244, 247, 249).[1]  The ALJ found these opinions to be "consistent with the evidence as a whole" and gave them "great weight."  (Tr. 20).  This finding is not supported by substantial evidence and reflects a misunderstanding of the law regarding severe impairments.

Many of Plaintiff's doctors and consulting examiners concluded that Plaintiff suffers from depression and/or anxiety, as well as a pain disorder.  (See Tr at 178, 195-96, 225, 230-39, 241, 250, 266, 271, 278, 314, 315, 339).[2]  Indeed, the record contains no opinions from an *examining* medical source to the contrary.  The Commissioner's regulations require that "more weight [be given] to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined [the claimant]."  20 C.F.R. § 404.1527(d)(1); accord Broughton v. Heckler, 776 F.2d 960, 962 (11th Cir. 1985); Swindle v. Sullivan, 914 F.2d 222, 226 n.3 (11th Cir. 1990).  Furthermore, "[t]he opinions of nonexamining, reviewing physicians, . . . when contrary to those of the examining physicians, are entitled to little weight, and standing alone do

---

[1]Notably, as Plaintiff points out, neither of these consultants had the benefit of reviewing Dr. Shepherd's report before rendering their opinions.  Dr. Shepherd, unlike any of the other examining doctors, administered a battery of standard psychological tests.

[2]At least one doctor (who is not mentioned in the ALJ's opinion) also diagnosed Plaintiff as suffering from a psychotic disorder.  (Tr. 266, 339).

21

not constitute substantial evidence." Sharfarz v. Bowen, 825 F.2d 278, 280 (11th Cir. 1987); accord Spencer on behalf of Spencer v. Heckler, 765 F.2d 1090, 1094 (11th Cir. 1985)("'[t]o attempt to evaluate disability without personal examination of the individual and without evaluation of the disability as it relates to the particular person is medical sophistry at best'"); see also Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir. 1988); but cf. Edwards v. Sullivan, 937 F.2d 580, 584-85 (11th Cir. 1991)(finding that the ALJ did not err in relying on the opinion of a non-examining physician where the physician's opinion was consistent with the opinions of examining physicians).  For these reasons, the court finds that the ALJ erred to the extent he relied on the opinions of the non-examining agency consultants to conclude that Plaintiff's mental impairments are not severe and/or that Plaintiff does not suffer from depression or anxiety.

Other evidence in the record also fails to support the ALJ's findings regarding Plaintiff's mental health.  The Commissioner's regulations state that "[a]n impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984).  Only "claims based on the most trivial impairments" may be rejected at this stage of the five-step analysis.  McDaniel v.

22

Bowen, 800 F.2d 1026, 1031 (11th Cir.1986).  The abnormality must be "so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work . . . ."  McDaniel, 800 F.2d at 1031.  Thus, the plaintiff's burden of establishing a severe impairment "is mild."  Id.

Dr. Brown, who conducted a psychiatrist evaluation of Plaintiff, assigned Plaintiff a global assessment of functioning score of 60.  (Tr. 225).  This corresponds to a finding that Plaintiff experiences "moderate difficulty in social, occupational, or school functioning."  See Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., American Psychiatric Association 2000).  The ALJ, in contrast, stated that Dr. Brown "gives no indication of any severe mental impairment."  (Tr. 21-22).  This finding reflects a misunderstanding of the law regarding severe impairments and is not supported by substantial evidence.

Furthermore, as Plaintiff argues, the ALJ failed to make any explicit findings regarding Plaintiff's diagnosed anxiety, pain disorder, and depression.  Indeed, the analysis portion of the ALJ's opinion contains no explicit reference to these diagnoses.[3]

_____

[3]The ALJ did discuss his reasons for rejecting Dr. Shepherd's *functional* assessment of Plaintiff, and he also concluded that Plaintiff's unspecified "mental impairments" could be expected to result in "mild restrictions of daily living."  (Tr. at 21-22).  This discussion is not sufficient to demonstrate that the ALJ properly applied the law regarding medical opinions.

AO 72A
(Rev.8/82)

The law is clear: "The ALJ [must] state specifically the weight accorded to each item of evidence and why he reached [his] decision." Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981). "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits of the claim is rational and supported by substantial evidence." Cowart, 662 F.2d at 735. See also Sharfarz, 825 F.2d at 279 (finding that the ALJ is required to "state with particularity the weight he gave different medical opinions and the reasons therefor"). "[R]emands are required when an ALJ fails to consider properly a claimant's condition despite evidence in the record of the diagnosis." Vega v. Massanari, 265 F.3d 1214, 1219 (11th Cir. 2001). Although the ALJ did specify the weight he generally afforded to the various mental health professionals of record, the ALJ failed to explain why he did not credit their diagnoses of pain disorder, depression, and anxiety. For this reason, remand is required.

Finally, as Plaintiff argues, the ALJ's opinion demonstrates that he failed to consider the cumulative effect of Plaintiff's mental and physical impairments, including the pain disorder recognized even by the consulting psychologists. The ALJ must consider and articulate the combined effects of all a claimant's impairments in evaluating disability. Walker v. Bowen, 826 F.2d 996, 1001 (11th Cir. 1987)(stating that

24

it is the ALJ's duty to make "specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the claimant to be disabled").

The ALJ rejected Plaintiff's subjective complaints of pain in part because he found that none of Plaintiff's impairments were sufficiently severe to give rise to the pain described by Plaintiff. (Tr. 21). According to the <u>Diagnostic and Statistical Manual of Mental Disorders</u> ("<u>DSM</u>")(American Psychiatric Association, 4th ed. 1994), p. 461, a pain disorder is a mental disorder characterized by pain in one or more anatomical sites that "causes clinically significant distress or impairment in social, occupational, or other important areas of functioning." "Psychological factors are judged to have an important role in the onset, severity, exacerbation, or maintenance of the pain." <u>Id</u>. <u>See also</u> 14 Roscoe N. Gray & Louise J. Gordy, eds., <u>Attorneys' Textbook of Medicine</u>, ¶ 178.34 (3rd ed. 2000)(stating that pain disorder, which is one of several recognized somatoform disorders, is characterized by "the preoccupation with pain in the absence of physical findings"). The ALJ's opinion fails to demonstrate that he understood Plaintiff's diagnosed pain disorder, or that he considered its possible connection to Plaintiff's reported pain. For this reason, remand is required.

25

Given that remand is required for a number of reasons associated with the ALJ's treatment of Plaintiff's diagnosed mental impairments, the court finds it unnecessary to discuss Plaintiff's remaining arguments.   On remand, the Commissioner should consider these arguments in addition to the court's opinion regarding Plaintiff's mental impairments.

**V.**    **CONCLUSION**

For the foregoing reasons, the Commissioner's final decision denying Plaintiff's application for a period of disability and disability insurance benefits is **REVERSED**, and this case is **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

**IT IS SO ORDERED** this 24th day of October, 2005.

_____    /s/ Gerrilyn G. Brill    _____
GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

T:\FINAL.SS\BlackOlanda.wpd

26